**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| JIM S., | § | |
|       **Plaintiff,** | § | |
| | § | |
| | § | **Civil Action No. 3:18-CV-2179-BH** |
| | § | |
| ANDREW SAUL, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
|       **Defendant.** | § | **Consent Case**[1] |

## MEMORANDUM OPINION AND ORDER

Jim S. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner)[2] denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act. (*See* docs. 1; 13.) Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for reconsideration.

## I. BACKGROUND

On August 25, 2015, Plaintiff filed his application for DIB, alleging disability beginning on January 1, 2011. (doc. 10-1 at 206.)[3] His claim was denied initially on September 28, 2015 (*Id.* at 95), and upon reconsideration on November 16, 2015 (*id.* at 102). On February 23, 2016, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 108.) He appeared and testified at a hearing on April 21, 2017. (*Id.* at 30.) On July 27, 2017, the ALJ issued a decision

---

[1]By consent of the parties and order filed October 29, 2018 (doc. 12), this matter has been transferred for the conduct of all further proceedings and the entry of judgment.

[2]At the time this appeal was filed, Nancy A. Berryhill was the Acting Commissioner of the Social Security Administration, but Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019, so he is automatically substituted as a party under Fed. R. Civ. P. 25(d).

[3]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

finding him not disabled. (*Id.* at 11.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on September 25, 2017. (*Id.* at 204-05.) The Appeals Council denied his request for review on July 9, 2018, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5-7.) He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

## A.   Age, Education, and Work Experience

Plaintiff was born on August 15, 1969, and was 47 years old at the time of the hearing. (doc. 10-1 at 206.) He had completed two years of college and could communicate in English. (*Id.* at 235.) He had past relevant work as a semi-conductor wafer-etcher and as a semi-conductor processor. (*Id.* at 73-74.)

## B.   Medical, Psychological, and Psychiatric Evidence[4]

On November 23, 2010, Plaintiff presented to the Veterans Affairs Medical Center (VAMC) with complaints of worsening anxiety. (doc. 10-1 at 283.) He reported that his upbringing made him anxious around others, and his anxiety had worsened during military service because he lived around a lot of people in the barracks. (*Id.*) He also reported feeling tense "all the time even at home," and had to quit his job in a silicon manufacturing company due to his worsening anxiety. (*Id.*) He stated that in 2005, a doctor prescribed him Wellbutrin for his anxiety disorder, but he stopped taking the medication in 2006. (*Id.*)

Plaintiff joined an anxiety support group and attended three therapy sessions in January 2011. (*Id.* at 1103-05.) Clinical notes from those sessions noted that he participated and had some interactions with other group members. (*Id.*)

---

[4] Because only Plaintiff's psychological and psychiatric impairments are at issue, physical medical evidence is noted only when it includes information relevant to the mental impairments at issue.

On January 24, 2011, Plaintiff presented to the VAMC and was seen by Anadhi Sethupathi, M.D. (*Id.* at 1102-03.) He reported that when having a panic attack, he experienced chest tightness and a racing heart. (*Id.* at 1102.) His anxiety continued to worsen when around other people, and he was having several anxiety episodes every day. (*Id.*) Plaintiff lived alone and admitted to having mild depression, but he denied suicidal or homicidal ideation. (*Id.*) Dr. Sethupathi noted that Plaintiff had fair insight and judgment; his speech was normal; his thought process was coherent and goal directed; he appeared alert, oriented, and fair groomed; and he showed no delusions. (*Id.*) He assessed Plaintiff with mildly depressed mood but continued anxiety, and updated his antidepressant regimen to include Effexor, Buspar, Clonazepam, and Lexapro. (*Id.* at 1103.)

On February 16, 2011, Plaintiff returned to the VAMC for a drop-in appointment with staff psychologist, Amy Anthony, Ph.D. (*Id.* at 1093.) He reported not benefitting from group therapy and felt that others in the group were "judging" him. (*Id.*) He requested a referral for individual cognitive-behavioral therapy (CBT) sessions. (*Id.*) Dr. Anthony opined that Plaintiff's Minnesota Multiphasic Personality Inventory-2 (MMPI-2) profile was "very elevated" and showed possible "exaggeration of symptoms," but it also suggested that he was experiencing a high level of emotional distress, self-criticism, depression, pessimism, anger and resentment, feelings of being mistreated, anxiety, social alienation, and insecurity in social situations. (*Id.* at 1092.) She also opined that Plaintiff's severe anxiety, insecurity about his adequacy as a person, and rigid beliefs about himself and how others perceived him, had hindered him from having satisfying relationships, and individual CBT would likely correct some of his cognitive distortions and negative core beliefs. (*Id.* at 1092.)

On March 17, 2011, Plaintiff returned to Dr. Sethupathi. (*Id.* at 1077.) He reported having

3

difficulty concentrating, getting easily distracted, and that he "flunked" out of college due to poor concentration.  (*Id.*)  He stopped taking Buspar because it made him feel dizzy, but his anxiety continued to get worse when he was around a lot of people.  (*Id.*)  Despite his attempts at avoiding "social situations," he was still having multiple "anxiety episodes" on a daily basis.  (*Id.*)

On April 12, 2011, Plaintiff presented to Dr. Spain to discuss his therapy options.  (*Id.* at 1061.)  He reported problems interacting with others since childhood, and his inability to engage in "banter" "prohibit[ed] him from developing friendships and other relationships with colleagues or fellow students."  (*Id.*)  He felt that his problems with depression might have manifested as anxiety, but he did not have a history of severe depression or suicidal ideation. (*Id.*)

In April and May of 2011, Plaintiff attended five CBT sessions with Dr. Spain.  (*Id.* at 639-41, 647-50, 1057-58.)  Dr. Spain reported that Plaintiff presented with symptoms of depression and anxiety, and that his primary treatment goal was to learn how to socialize with others and to eventually return to college.  (*Id.* at 1057-58.)  Plaintiff appeared well-groomed, his speech was normal for tone and pace, he made appropriate eye contact, he was polite, and he demonstrated good concentration and attention.  (*Id.* at 639-41, 647-50, 1057-58.)  His affect was anxious, but he did not report current suicidal or homicidal thoughts, intentions, or plans.  (*Id.*)  At his first three sessions, he rated his mood as a 4 or 5 on a 0-10 scale, but no mood rating was noted from his last two sessions.  (*Id.*)  At his last session on May 16, 2011, Plaintiff stated that he was still "working through the experience of leaving his last job . . . realizing that he left because he was uncomfortable with socializing with his co-workers."  (*Id.* at 639.)  He also stated that he was not interested in engaging in behavioral experiment strategies or exploring cognitive patterns, and preferred to be by himself at home "rather than participating in therapy." (*Id.*)

4

On May 21, 2011, Plaintiff called the Veteran Affair's (VA) suicide prevention hotline and reported suicidal ideation. (*Id.* at 636-37.) The hotline responder noted that Plaintiff was "very disorganized" and unclear as to what he wanted from the call. (*Id.*) He stated that he felt worse than he ever had in the past and needed a psychiatric admission "to sort things out and get some structure back into [his] life." (*Id.*) He did not have a suicide plan or current intent, and agreed to call back if his feelings worsened. (*Id.*)

On May 27, 2011, Plaintiff saw Dr. Sethupathi to discuss his suicide hotline call. (*Id.* at 634-35.) He spoke about his anxiety issues and poor social communication, and about how he had not recovered from "the situations" that caused him to leave his job six months ago. (*Id.* at 634.) Ritalin helped him with his concentration, but he refused to start any antidepressants due to the side-effects. (*Id.*) Dr. Sethupathi noted that Plaintiff had fair eye contact, normal speech, fair insight and judgment, and no delusions or suicidal ideation; his mood was anxious; and his thought process was coherent and goal directed. (*Id.* at 635.)

On June 1, 2011, Plaintiff was transported to the hospital via ambulance after suffering a "nervous breakdown" at a Dallas Area Rapid Transit (DART) rail station. (*Id.* at 584-629.) He reported that he had confronted a passenger about smoking on the train platform, and DART police handcuffed him after he confronted a DART employee for not enforcing DART's no smoking rules. (*Id.* at 607.) DART police released him and dropped him off near his home, but made him sign an agreement to stay off DART for 12 months. (*Id.* at 584.) He became "so overwhelmed with anger, anxiety, [and] frustration" that he broke down and wept uncontrollably. (*Id.*)

On the same day, Plaintiff was transferred from the hospital to the VAMC and was examined by Fred Gioia, M.D. (*Id.* at 592.). Dr. Gioia noted that Plaintiff appeared "extremely anxious" and

uncomfortable with any personal interaction, and became distressed when asked to discuss the train incident. (*Id.*) Plaintiff displayed fair eye contact, anxious mood, psychomotor agitation, and some insight, but was also cooperative, talkative, and showed "improving" judgment. (*Id.* at 594.) Dr. Gioia opined that Plaintiff was an "extremely anxious and socially award individual" with "strong ruminative tendencies regarding such deficiencies, bordering on obsessive and delusional thinking." (*Id.*) He also opined that he did not represent a threat to himself or others. (*Id.*) Monte Goen, M.D., also examined Plaintiff and noted that he had poor eye contact, unkempt hair, flat facial expressions, logical but somewhat circumstantial thought processes, dysphoric mood, restricted affect, fairly poor insight, and fair judgment. (*Id.* at 612.) He assessed Plaintiff with pervasive developmental disorder, anxiety disorder, and depression, and calculated a Global Assessment of Functioning (GAF) score of 45-50.[5] (*Id.*) Plaintiff was discharged the same day. (*Id.* at 580.)

On June 6, 2011, Dr. Spain issued a letter as part of Plaintiff's application to the VA for increased service-connected disability. (*Id.* at 578-79.) It stated that Plaintiff often presented as anxious and irritable, his thought content was at times tangential, and he demonstrated difficulty in expressing and experiencing emotions other than frustration and anger. (*Id.* at 579.) It also stated that Plaintiff had "a long history of difficulty maintaining jobs, completing his academic goals, and having close personal relationships due to his perceived difficulties in communication and socialization." (*Id.*)

On September 9, 2011, VA staff psychologist John Esthafer completed a mental disorders Disability Benefits Questionnaire (DBQ) for Plaintiff. (*Id.* at 363-70.) He noted that Plaintiff had been diagnosed with schizoid personality disorder with avoidant traits, social phobia, and

_____

[5]GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *See Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001).

generalized anxiety disorder (GAD), and he had a current GAF of 40. (*Id.* at 363-64.) Dr. Esthafer opined that Plaintiff's situational social anxiety would make job positions that required contact with the public or collaborative work difficult for him; his lack of desire for social contact, schizoid lifestyle, unusual thinking, lack of interest in activities, and flattened affect would contribute to inefficiency at work, difficulty relating to peers, and self-termination of employment; and his ruminative worry would contribute to overall tension and difficulty adapting to a work or social environment. (*Id.* at 366.) He concluded that Plaintiff's GAD was "at most a tertiary diagnosis as his primary ruminative worry [was] in regard to social functioning rather than a global worry about multiple aspects of his life." (*Id.* at 370.)

On September 27, 2011, Plaintiff presented to a nurse practitioner (NP) for a neurosurgery consult for his low back problems. (*Id.* at 1948-52.) She noted that he had been diagnosed with anxiety disorder and depression and had a service-connected disability rating of 90 percent.[6] (*Id.* at 1948, 1951.) During his examination, Plaintiff "frequently interrupted [her], became argumentative, and [was] insistent that something needed to be done regarding his cervical spine complaints," and he dismissed her answers regarding his parethesia. (*Id.* at 1952-53.)

On October 18, 2011, Plaintiff presented to Dr. Sethupathi for a scheduled appointment. (*Id.* at 712.) He reported not leaving the house because of his anxiety and not having a car. (*Id.*) He was able to go out with a friend for a game and have a normal conversation, but remained worried about having panic attacks when outside the house, and he was still not interested in attending a social skills group. (*Id.*) Plaintiff returned to Dr. Sethupathi on January 19, 2012, May 17, 2012,

---

[6]The breakdown of Plaintiff's service-connected disability rating by medical impairment was 70 percent to anxiety disorder; 20 percent to lumbosacral or cervical strain; 10 percent to limited flexion of knee; 10 percent to inflammation of sciatic nerve; 10 percent to impairment of clavicle or scapula' 10 percent to limited motion of wrist; and 10 percent to inflammation of sciatic nerve. (*See* doc. 10-1 at 1948.)

and September 5, 2012; the clinical notes from those visits were generally the same. (*Id.* at 667-68, 678-79, 691-92, 712-14.)

On March 21, 2013, another examiner[7] interviewed Plaintiff and completed a second mental disorders DBQ. (*Id.* at 842-50.) He noted that Plaintiff had been diagnosed with GAD, social phobia, and schizoid personality disorder, and had a current GAF of 48. (*Id.* at 844.) He opined that Plaintiff's mental disorder diagnoses were an occupational and social impairment resulting in him having deficiencies in most areas like work, school, family relations, judgment, thinking, and mood. (*Id.* at 846-47.) Plaintiff stated that if he was not on his psychotropic medication, his mind tended to wander to things that made him anxious, which resulted in him having repeated "run-ins" with supervisors and co-workers, and the same happened with the June 2011 incident at the DART rail station. (*Id.* at 847.) The examiner opined that Plaintiff's mental disorders caused the following symptoms: anxiety; suspiciousness; flattened affect; circumstantial, circumlocutory, or stereotyped speech; impaired judgment; difficulty in establishing and maintaining effective work and social relationships; difficulty in adapting to stressful circumstances, including work or a work-like setting; and inability to establish and maintain effective relationships. (*Id.* at 848-49.) He further opined that given Plaintiff's impaired ability to understand and negotiate complex social situations, he would only be able to function on a job if he was "left totally alone" because he would "be hard-pressed to avoid antagonizing and alienating others," even if the job had only incidental interactions with other people. (*Id.* at 850.)

On September 23, 2015, State Agency Medical Consultant (SAMC) Susan Posey, PsyD.,

---

[7]The record does not identify the examiner's job title, medical profession, or speciality, but the DBQ stated that it could only be completed by a psychiatrist, a psychologist, or a closely-supervised licensed clinical social worker, nurse practitioner, clinical nurse specialist, or physician assistant. (*See* doc. 10-1 at 843.)

conducted a consultative evaluation of Plaintiff's medical records. (*Id.* at 82-84.) She opined that Plaintiff had a history of anxiety and depressive disorders, and his affective disorders were severe medically determinable impairments. (*Id.* at 82-83.) Dr. Posey concluded that there was insufficient evidence to evaluate Plaintiff's mental impairment disability claim for the time frame prior to the last insured date of March 31, 2013, and she was unable to perform a Psychiatric Review Technique (PRT) or a mental Residual Functional Capacity (RFC) assessment. (*Id.* at 83-84.) On November 10, 2015, SAMC Michael O'Callaghan, Ph.D., affirmed Dr. Posey's opinion finding insufficient evidence to evaluate Plaintiff's mental impairment disability claim. (*Id.* at 89-92.)

**C.     Hearing**

On April 21, 2017, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 30-79.) Plaintiff was represented by an attorney. (*Id.* at 30.)

**1.     Plaintiff's Testimony**

Plaintiff testified that he last worked in 2010 and had to quit his job because his social problems "hit [him] like a brick wall," and "it all shut down." (*Id.* at 37.) He was unable to interact with anyone because he was "too anxious" and had "confrontations" with his co-workers. (*Id.*) He followed orders while in the Navy, but was stubborn, very defensive, and "difficult to handle." (*Id.* at 38.) He was once handcuffed by police and "kicked off DART Rail for a year" after confronting a DART employee for not telling a passenger to stop smoking on the rail platform. (*Id.* at 38-39.) He would get into arguments about politics with his co-workers. (*Id.* at 39.) He "loved" working and "loved" his prior jobs, but the social interactions at work made him nervous and caused his blood pressure to jump. (*Id.*)

Plaintiff received medical treatment from the VA and was initially prescribed Buspar, which

"saved [his] life because . . . [he] was just that tense." (*Id.* at 39-40.) From 2011 to 2013, he received mental health treatment at a VA clinic in Austin, Texas. (*Id.* at 40-41.) He attempted group therapy for anxiety management but quit attending because he became confrontational, and the sessions angered him. (*Id.* at 41-42, 45.) He visited with VA psychiatrists, but they only seemed able to prescribe medication. (*Id.* at 42.) He also attended CBT sessions with a psychologist and received assignments, but they did not "work out" for him. (*Id.* at 43-44.) His chronic pain would feed into his GAD, which resulted in him getting into a "real argument" with a nurse during a neurosurgery consultation in September 2011. (*Id.* at 45-46, 48-49.) He had been rated 100 percent in "individual unemployability" by the VA with 70 percent for his anxiety disorder. (*Id.* at 46.) He was only able to work at Motorola for four years because he could move to different departments after getting into arguments with co-workers. (*Id.* at 47-48.) He went to the grocery store "fairly frequently," but standing in the checkout line inflamed his back pain and made him really anxious. (*Id.* at 50.) He lived alone and had one friend with whom he stayed in phone contact. (*Id.* at 50-51.) The VA had been treating him for his anxiety by providing him "a running script of Clonazepam." (*Id.* at 56-57.)

## 2. VE's Testimony

The VE testified that Plaintiff had previous work experience as a semi-conductor wafer-etcher stripper, which was medium work with a SVP of 2, and as a semi-conductor processor, which was medium work with a SVP of 3. (*Id.* at 73-74.) Plaintiff would not be able to perform any type of work due to his mental limitations if he had a marked limitation in the ability to function independently, appropriately, effectively, and on a sustained basis when it came to relating appropriately with co-workers or supervisors on the job. (*Id.* at 74.) A hypothetical person with the

same age, education, and work experience history as Plaintiff, who had moderate difficulties in mental functioning, could do sedentary exertional level work. (*Id.* at 75.) He was able to function independently, appropriately, and effectively on a sustained basis; understand, remember, or apply information; concentrate, persist, or maintain pace; adapt and manage himself; do simple tasks; and have interpersonal contact that was no more than incidental to the work required, meaning no contact with the public, no teamwork with other employees, no work in tandem with co-workers, and only occasional interaction with a supervisor. (*Id.*) The hypothetical person could perform sedentary, SVP-2 level work, including that of a titled addresser (8,600 jobs nationally), a semi-conductor bonder (20,000 jobs nationally), and a titled printed circuit layout taper (10,000 jobs nationally). (*Id.* at 75-76) If the hypothetical person was limited to lifting 20 pounds occasionally and 10 pounds frequently; could stand, walk, and sit six out of eight hours; and had frequent use of the upper extremities; he could perform light, SVP-2 level work, including that of a mail clerk (102,000 jobs nationally), a photocopying machine operator (18,000 jobs nationally), and a housekeeping cleaner (247,000 jobs nationally). (*Id.* at 76-77.)

**D.    <u>ALJ's Findings</u>**

The ALJ issued a decision denying benefits on July 27, 2017. (*Id.* at 11.) At step one, he found that Plaintiff had met the insured status requirements through March 31, 2013, and had not engaged in substantial gainful activity since the alleged onset date of January 1, 2011. (*Id.* at 14.) At step two, the ALJ found that he had the following severe impairments: spine disorder, obesity, and affective disorder. (*Id.* at 16.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.*)

Next, the ALJ determined that Plaintiff retained the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except he had moderate difficulties in functioning independently, appropriately, and effectively on a sustained basis; was able to understand, remember, and apply information; concentrate, persist and maintain pace; and adapt and manage himself, provided he was limited to simple tasks and interpersonal contact incidental to the work performed, meaning no public contact, no teamwork or working in tandem with co-workers, and only occasional interactions with a supervisor. (*Id.* at 18.)  At step four, the ALJ determined that Plaintiff was unable to perform his past work (*Id.* at 22.)  At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that he was not disabled whether or not he had transferable job skills, but considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. (*Id.* at 22-23.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time from January 1, 2011, through March 31, 2013, the date last insured. (*Id.* at 24.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not

reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to

be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## III. ISSUES FOR REVIEW

Plaintiff presents three issues for review:

1.      The Administrative Law Judge (ALJ) erred in failing to include in his hypothetical question to the vocational expert (VE) all of [Plaintiff's] limitations that he accepted as true.

2.     The ALJ's residual functional capacity (RFC) finding for a reduced range of sedentary work is not supported by substantial evidence.

3.     The ALJ [e]rred in [f]ailing [t]o [m]ake [a] [f]inding as to [w]hether [Plaintiff] [c]ould [m]aintain [e]mployment.

(doc. 13 at 5.)

## A.     RFC Assessment[8]

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence.

(doc. 13 at 18-21.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no

---

[8]Although listed first, Plaintiff's issue regarding the ALJ's hypothetical to the VE implicates step four, which follows the RFC assessment in the sequential evaluation process. Accordingly, his second issue regarding the RFC assessment is considered first.

allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id*. Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding Plaintiff's alleged symptoms and limitations, and reviewing the evidence of record, the ALJ determined that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except he had moderate difficulties in functioning independently, appropriately, and effectively on a sustained basis; was able to understand, remember, and apply information; concentrate, persist and maintain pace; and adapt and manage himself, provided he was limited to simple tasks and interpersonal contact incidental to the work performed, meaning no public contact, no teamwork or working in tandem with co-workers,

and only occasional interactions with a supervisor.  (doc. 10-1 at 18.)

Plaintiff argues that the RFC is not supported by medical opinion evidence, and that "the ALJ impermissibly drew his own medical conclusions from the medical evidence of record without relying on a medical expert's help."  (doc. 13 at 18-20.)  The Commissioner admits that the ALJ's RFC assessment "does not directly correspond to the opinion of any particular physician of record," but contends that his determination "is consistent with the evidence of record."  (doc. 14 at 7-8.)

In *Ripley v. Chater*, the claimant argued that the ALJ failed to develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion.  67 F.3d 552 (5th Cir. 1995).  The Fifth Circuit noted that although an ALJ should usually request a medical source statement describing the types of work that the applicant was still capable of performing, the absence of such a statement did not necessarily make the record incomplete.  *Id*.  Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision.  *Id*.  The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work, so the ALJ's RFC determination was not supported by substantial evidence.  *Id*.  The Fifth Circuit remanded the case with instructions to the ALJ to obtain a report from a treating physician.  *Id*. at 557-58.  Notably, it rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts.  *Id*. at 558 n.27; *see also Oderbert v. Barnhart*, 413 F. Supp.2d 800, 803 (E.D. Tex. 2006) ("*Ripley* clarifies that an [ALJ] cannot determine from raw medical data the effects of impairments on claimants' ability to work.").

Here, the ALJ does not identify the medical opinions that are the source of the mental limitations he determined for Plaintiff. He considered Plaintiff's longitudinal medical records and found that they were consistent with his "description of particular difficulty with interacting with others" and supported "mild-to-moderate psychological limitations." (doc. 10-1 at 21.) He also referenced the clinical notes of the NP, which noted that Plaintiff frequently interrupted her and was argumentative, as well his service-connected disability rating, which showed that he had a history of anxiety problems. (*Id.*) He concluded that these findings warranted "a limitation to unskilled work with further reductions in frequency of contact with others." (*Id.*) None of that medical evidence addressed the effects of Plaintiff's conditions on his ability to work, however. *See Browning v. Barnhart*, No. 1:01-CV-637, 2003 WL 1831112, at *7 (E.D. Tex. Feb. 27, 2003) (finding despite the fact that there was a vast amount of treating sources' medical evidence in the record establishing that plaintiff suffered from certain impairments, including voluminous progress reports, clinical notes, and lab reports, "none [made] any explicit or implied reference to effects these conditions h[ad] on claimant's ability to work" and the ALJ could not rely on that "raw medical evidence as substantial support for" the claimant's RFC); *see also Turner v. Colvin*, No. 3:13-CV-1458-B, 2014 WL 4555657, at *5 (N.D. Tex. Sept. 12, 2014) ("[E]vidence which merely describes Plaintiff's medical conditions is insufficient to support the ALJ's RFC determination.") (citation omitted).

Additionally, the SAMCs found there was insufficient evidence to evaluate Plaintiff's mental impairments for the relevant disability period, and did not offer an opinion on his functional abilities. (doc. 10-1 at 83-84, 90-91.) Although the ALJ acknowledged this in his decision and gave no weight to their opinions, he did not identify an acceptable medical source that supports his RFC

determination. (*Id.* at 21.) While the ALJ may choose to reject the opinions of the SMACs, "he cannot independently decide the effects of Plaintiff's . . . impairments on his ability to work, as that is expressly prohibited by *Ripley*." *Shugart v. Astrue*, No. 3:12-CV-1705-BK, 2013 WL 991252, at *5 (N.D. Tex. Mar.13, 2013).

There are no medical opinions in the record regarding the effects Plaintiff's mental impairments had on his ability to work, particularly in the areas of understanding, remembering, carrying out instructions, persisting and maintaining pace, and adapting and managing one's self, so the ALJ appears to have relied on his own interpretation of the medical and other evidence, which he may not do. *See Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009) ("An ALJ may not–without the opinions from medical experts–derive the applicant's [RFC] based solely on the evidence of his or her claimed medical conditions, [and] an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."); *see also Tyler v. Colvin*, No. 3:15-CV-3917-D, 2016 WL 7386207 (N.D. Tex. Dec. 20, 2016) (finding that an ALJ impermissibly relied on his own medical opinion to develop his RFC determination); *Davis v. Astrue*, No. 1:11-CV-00267-SA-JMV, 2012 WL 6757440 (N.D. Miss. Nov. 6, 2012) ("In formulating a claimant's RFC, the ALJ-a layperson-may not substitute his own judgment for that of a physician."), *adopted by* 2013 WL 28068 (N.D. Miss. Jan. 2, 2013). Consequently, substantial evidence does not support the mental aspect of the ALJ's RFC determination. *See Geason v. Colvin*, No. 3:14-CV-1353-N, 2015 WL 5013877, at *5 (N.D. Tex. July 20, 2015) ("Because the ALJ erred in making an RFC determination without medical evidence addressing the effect of Plaintiff's impairment on her ability to work, the ALJ's decision is not supported by substantial evidence."); *Medendorp v. Colvin*, No. 4:12-CV-687-Y, 2014 WL 308095, at *6 (N.D. Tex. Jan. 28, 2014)

(finding because the ALJ rejected the only medical opinion in the record that he had analyzed that explained the effects of the claimant's impairments on her ability to perform work, there was no medical evidence supporting the ALJ's RFC determination); *Lagrone v. Colvin*, No. 4:12-CV-792-Y, 2013 WL 6157164, at *6 (N.D. Tex. Nov. 22, 2013) (finding substantial evidence did not support the ALJ's RFC determination where the ALJ rejected all medical opinions in the record that might explain the effects of the claimant's physical impairments on his ability to perform work and where there were no such opinions as to claimant's mental impairments).

## B. <u>Harmless Error</u>

Because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party have been affected," Plaintiff must show he was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing his RFC. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). To establish prejudice, Plaintiff must show that the ALJ's failure to rely on a medical opinion as to the effects his impairments had on his ability to work casts doubt onto the existence of substantial evidence supporting his disability determination. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).

The ALJ's failure to rely on a medical opinion in determining Plaintiff's RFC casts doubt as to whether substantial evidence exists to support the finding that he is not disabled. *See Williams*, 355 F. App'x at 832 (finding the decision denying the claimant's claim was not supported by substantial evidence where the RFC was not supported by substantial evidence because the ALJ

rejected the opinions of the claimant's treating physicians and relied on his own medical opinions as to the limitations presented by the claimant's back problems in determining the RFC); *see also Thornhill v. Colvin*, No. 14-CV-335-M, 2015 WL 232844, at *11 (N.D. Tex. Dec. 15, 2014) (finding prejudice "where the ALJ could have obtained evidence that might have changed the result—specifically, a medical source statement"), *adopted by* 2015 WL 232844 (N.D. Tex. Jan. 16, 2015). Accordingly, the error is not harmless, and remand is required on this issue.[9]

## IV. CONCLUSION

The Commissioner's decision is **REVERSED,** and the case is **REMANDED** to the Commissioner for further proceedings.

**SO ORDERED** on this 25th day of September, 2019.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[9]Because this error requires remand, and determination of Plaintiff's RFC on remand will likely affect the remaining issues, they will not be addressed here.